SOUTHERN ANTHRACITE COAL CO. v. HODGE.

Opinion delivered May 8, 1911.

1. DEATH—ACTIONS FOR CAUSING—JOINDER.—Causes of action for the benefit of the estate of a person wrongfully killed and for the benefit of his widow and next of kin may be united in a suit brought by the decedent's administratrix. (Page 314.)

2. PLEADING—REMEDY FOR UNCERTAINTY.—Uncertain or defective allega-
tions in a pleading should be reached by motion to make more specific,
and not by demurrer. (Page 314.)

3. CONTINUANCES—DISCRETION OF TRIAL COURT.—It was not an abuse of
discretion to deny the defendant a continuance on the ground that
the plaintiff had amended his complaint, where such amendment merely
conformed the complaint to testimony developed at a former trial,
and where no injury could have resulted to defendant from a denial
of such continuance. (Page 314.)

4. EVIDENCE—EXPLANATION OF CONVERSATION.—Where the plaintiff seeks
to recover for the killing of her intestate alleged to have been caused
by misleading information furnished by defendant's employee, testi-
mony as to the meaning of a conversation between intestate and such
employee was competent if the language used had a special meaning,
and was not prejudicial if it had no such meaning. (Page 315.)

5. DEATH—ACTION FOR CAUSING—PROXIMATE CAUSE.—Where plaintiff's
intestate, a miner, before descending into a mine, inquired of the
fireman whose duty it was to furnish steam for operating the fan
which cleared the mine of gas as to how long the fan had been
running, and the fireman negligently misled him into believing that it
had been running long enough to render the mine safe, the negligence
of such fireman was the cause of the injury which resulted to such
intestate from descending into the mine prematurely. (Page 318.)

6. APPEAL AND ERROR—HARMLESS ERROR.—While it was error, in an action
for negligent killing of plaintiff's intestate, to prove what intestate
said, as to his financial condition, after he received the injuries which
resulted in his death, such error was not prejudicial where his finan-
cial condition was proved by competent testimony, and such testimony
was not pressed upon the attention of the jury in the argument and
the jury's award of damages was not excessive. (Page 319.)

Appeal from Pope Circuit Court; *Hugh Basham,* Judge;
affirmed.

STATEMENT BY THE COURT.

This suit was brought by appellee as administratrix to re-
cover damages for the widow and next of kin, and the estate of
the deceased, her husband, Joseph Hodge, for his wrongful death,
caused, it was alleged, by negligence of appellee company through
its servant, Ab. Edwards, in giving said Hodge misleading in-
formation and lowering him into a mine filled with inflamma-
ble gas.

The amended complaint alleged "that the burning of the
said Joseph Hodge, and his subsequent death, was occasioned

by the carelessness and negligence of Ab. Edwards, an agent and employee of the defendant company, as follows: that the said Ab. Edwards on that day was acting as fireman and engineer at the shaft of said mine, and it was his duty to fire up said boilers to furnish steam to operate the fan, and, after said fan had been running a sufficient length of time to clear the mine of gas and make it safe, to lower the pumper, Joseph Hodge, down into said mine to pump the water out of same."

"That the deceased, Joseph Hodge, was not at the mine on Sunday until about 7 o'clock in the evening, where he went for the purpose of going into the mine to work; that, when he arrived for the purpose of ascertaining whether it would be safe to go into the mine, he asked Ab. Edwards, who was in charge, as above set forth, for what length of time the fan had been in operation, and the said Ab. Edwards carelessly, negligently and recklessly told the said Hodge that the fan had been running for more than an hour and a half, when in truth and in fact the fan had been in operation but a few minutes, which the said Ab. Edwards then and there well knew, thereby negligently, carelessly and recklessly deceiving said Hodge, causing him to believe the mine safe to enter and under said belief, induced by the careless, negligent and reckless information from the said Ab. Edwards to said Joseph Hodge, he entered the said mine before the same was clear of gas, and was injured as above set forth, from which injuries he died.

"That the said Ab. Edwards, being in charge of the engine as aforesaid, deceived the deceased about the length of time the fan had been in operation, did carelessly, negligently and recklessly lower the deceased into the said mine, at the time knowing the fan had not been in operation for a sufficient length of time to remove the gas from the mine, thereby recklessly, negligently and carelessly causing an explosion and the injuries to the deceased, from which injuries he died."

Ten thousand dollars damages for pain and suffering was asked under the first count of the complaint, and under the second count, for the benefit of the estate, twenty-five thousand dollars.

A demurrer was filed to the amended complaint, challenging its sufficiency and the right of plaintiff as administratrix to sue

for pain and suffering of deceased, or at all, and for a defect and misjoinder of parties plaintiff.

It was overruled, and a motion to strike out certain parties to the complaint was also filed and overruled. On the filing of the amended complaint on the same day the defendant asked a continuance, on the ground of surprise, because the amendment "set up an entirely new and separate cause of action," etc., which motion was overruled, and the defendant excepted.

The answer to the amended complaint denied plaintiff's right as administratrix to sue, and also right to bring an action for pain and suffering; admitted "that it was the duty of Joseph Hodge to go down to the bottom of the shaft and start the pump after the fan had been running a sufficient length of time to clear the mine of gas, that it was his duty to examine said mine and see if the same was safe before he went into it, and that he well knew the said mine contained gas and was dangerous when the fan had been stopped for 24 hours or more, and admits that it was dangerous to go into the said mine to work until after the fan had been in operation for an hour or more, and this fact was well known to Joseph Hodge; denied that on Sunday the mine was usually cleared of gas by 7 o'clock in the evening, and alleged "that it was the duty of the pumper to examine the mine and decide for himself when it was safe for him to go down into the said mine;" denied that Joseph Hodge was burned upon his arriving at the bottom of the mine, and that he was hurt without fault on his part; admits fire was set to inflammable gas that was in the mine, because the fan had not been running long enough to drive out same, and admits deceased caused his death by setting fire to the gas from an open lamp, and charges that he was guilty of negligence himself in using an open lamp to go into the air course where he knew there was gas.

Defendant denied that the burning and death of Joseph Hodge was caused by carelessness and negligence of Ab. Edwards, and that Ab. Edwards had any authority or power to advise said Joseph Hodge as to whether said mine was safe; stated it was the duty of Ab. Edwards under the direction of Joseph Hodge to act as fireman at the boilers, and denied that it was his duty to act in the matter except under the direction and control of Joseph Hodge, and that there was any duty imposed on him to inform

Joseph Hodge as to how long the fan had been running; admitted that it was the duty of said Edwards to obey Joseph Hodge and lower him into the mine whenever he directed said Edwards to do so; denied that Hodge asked Edwards what length of time the fan had been in operation, and that he had any right to ask any such question of Edwards, or to rely upon any answer that Edwards might make, and denied that Edwards "carelessly, negligently and recklessly told said Hodge that the fans had been in operation for more than an hour and a half, but admitted that the fan at the time had been in operation only a few minutes, which fact was well known to Hodge; denied that Hodge was deceived by Edwards, or led to believe the mine safe to enter, and that Edwards had any right or authority to make any such statement to Hodge, and that Hodge had any right to rely upon any statement made by Edwards; denied that Hodge believed the mine safe at the time, and that he had any belief induced by the carelessness, negligence or reckless information received from the said Ab. Edwards; admitted that Hodge entered the mine before it was clear of gas, and stated that that fact was well known to him; denied that Edwards negligently lowered Hodge into the mine, and that he knew said Hodge was going into the air course or in any other place of danger therein, and that said Edwards negligently caused said explosion or injuries to deceased; denied that plaintiff was entitled to damages in any sum, and, "answering both the first and second paragraph of the complaint, defendant states that said Hodge came to his death by his own carelessness and negligence, and that his death was due to the risk he assumed upon entering upon his work."

The testimony tended to show that Joseph Hodge was an experienced miner, working as a pumper in the coal mines of appellant, and had been for some years. This mine produced inflammable gas, in which it was dangerous to work, and it was necessary to clear it of such gas by means of fans run by steam, and it required from one hour and thirty minutes to two hours to drive the gas out of the mine. The boilers producing the steam for the operation of the fan, the pump, and the mine were located near the mouth of the shaft, which was 458 feet deep. The engine by which the fan was operated was one-half mile from the boilers, and it required 20 minutes for the steam, after it was

turned on, to reach it through a three-inch pipe. The engine that operated the pump to take the water out of the mine was located at the bottom of the shaft.

It was the duty of Joseph Hodge, the deceased, to keep the mine clear of water, which required four hours per day, and was done by pumping it out at night, that the miners might resume work in the morning, and he usually went down for that purpose about 7 o'clock. On Sundays the mine was not operated, the fire was drawn from under the boilers, and they were allowed to cool, and were washed out and fired up again in the evening in time to clear the mine of gas for the pumper to go down and start to pumping that the water might be out in time for work next day.

Deceased had long been at work at this mine, and was acquainted with conditions, and on the Sunday on which he was injured he was not in charge, and had gone to visit his family about eight miles away. He left home in the afternoon with his brother-in-law, and reached the mine about sundown. After the horse was put up, they went to the mine and ate supper. Ab. Edwards was at the mine firing the boilers. They met Edwards just the other side of the tipple, and as they went through there Norton came down out of the tipple, and all met about the same time. Anderson stated: "Joe Hodge said to Ab. Edwards, 'How long have you been going?' or 'How long have you been on?' I would not say for sure which. Ab. Edwards said, 'An hour and thirty-five or forty minutes.' Hodge said, 'All right.' Then Hodge and I went to the engine room and ate our supper. We then got a drink, and Hodge lit his lamp, walked towards the shaft, and got a piece of wood to make a pin out of. I do not think I asked him for what purpose the pin was, and I don't think he told me. I told him I had put the horse in the shed, and he said I could put him in the garden. He said: 'You go back to the house, and I will go down and start the pump, and you can go down next time.' He went and got into the cage, and I didn't get to the powder house, which is about 100 yards from the shaft, and the cage rung. I went to where the horse was, and then to Jackson. Jackson was operating the fan. We called him the fan man, I suppose. Jackson is my brother-in-law. Was by Jackson when I heard Hodge was burned. Joseph Hodge went down into the mine about thirty

minutes after Joe and Ab. had the conversation. Don't know whether Hodge whittled on the wood or not. I asked him what he was going to do. He said: 'Make a pin.' Saw Quince Norton there. Did not see anybody else."

Edwards testified he "was firing at defendant's mine, when Hodge was injured. My shift was from '3 to 11; started the fire in the boilers about 5 o'clock, and it takes right about two hours to get up steam; took longer when the boilers were dry and filled with cold water. I got up steam a few minutes before 7 that day. Hodge ran the pump, and was master mechanic. I worked under Hodge's directions. Hodge said to me on Saturday he was not going to start pumping until 9 o'clock that night. When he got through on Saturday night, he told me I need not hurry for he was not going to start pumping until 9 o'clock on Sunday night. It took five or six hours to get the water out of way of the men working, and sometimes it takes longer. Before that Hodge said this change would make it easier for me, and give me two hours and would give the other fellow two hours. On that Sunday afternoon, Hodge came through a few minutes before 7. I saw him when he came. Anderson came with him. Hodge did not come right to work when he came. Got out of the buggy, came to me, and Anderson carried the horse away. Hodge spoke to me, and said: 'How long before you are ready?' I said: 'I am ready now, except I have just turned the steam up to the fan.' He said: 'I will change clothes and eat a bite. By that time I guess everything will be all right.' and he walked off and did so. Anderson was not there when this talk was going on. This was immediately after Hodge got out of the buggy. Hodge then went into the mine about 20 or 25 minutes afterwards I reckon. He was not in the mine over five minutes when I heard a lumbering noise go off. After the lumbering went off, Hodge pulled the signal to be hoisted out. I hoisted him out and went to the cage. I got the cage on the landing, and Hodge began to holler. I went with a light, and saw that he was burned. I picked him up and carried him to the engine room. He did not say anything until I got him in the engine room, and he looked up and said: 'I am burned.' I said: 'Yes, you are in bad shape. I thought you were going down too early.' He said: 'Yes, I will have to be more careful from now on.'

"John White, Jr., was present. The latter came up some time near along then and helped me; also telephoned for the doctor; and while he was doing that I was pulling Hodge's clothes off. John White helped me get Hodge out of the cage. I toted Hodge. He was badly burned. John White took Hodge away. Hodge left there walking. It was dark, and I do not know whether he walked all the way or not. I did not see Quince Norton there until after Hodge was burned and carried in. Norton and My-trott were on top, and they came down, and we told them about the accident. They both came down from the tipple at the same time. The time that Hodge had been in the habit of going down in the mine depended on the time they got through work. It was sometimes later and sometimes not. Sometime he got in by 6 or 7 o'clock. I have known him to be as late as 9 o'clock. It was according to the work on the boilers. On this afternoon I started fire in the boilers as soon as the work was done. Just as soon as we got them filled with water, I started the fire."

John White, Jr., son of the manager of the company, tes-tified: "I knew Joe Hodge. Was in the mine the Sunday even-ing he was hurt. Went there a little before sundown. Went in my pony and cart. I went there for Mr. Mytrott. Just as I drove up I saw Hodge coming from the southwest, and I came from the northwest. He was in the buggy with Anderson. An-derson turned and drove the buggy off, and Hodge went towards the boiler room a little before I did. I saw Ab. Edwards there, and he and Hodge had a conversation. Hodge asked some ques-tions I did not understand, but I heard Ab. Edwards say he had just turned the steam on the fan. Hodge turned around, and went to the engine house, or somewhere, I do not remember. My business was to get Mr. Mytrott. I called him, and asked him if he was ready, and he said he was not. I then turned and started towards the store, and was gone about 20 minutes. By that time Hodge was going into the mine. He had just started down as I returned. I was there when he was pulled out. I heard him make a statement about his going down into the mine too soon. Ab. Edwards said: 'I thought you went too soon,' and he said: 'I won't do it any more.' He said: 'I expect I had better go to the house.' I telephoned Drs. Campbell and Smith. I am sixteen years old now. I heard Ab. Edwards say

to Hodge: 'I told you you went down too soon.' Hodge said: 'I won't do that any more. '"

Quince Norton testified as Anderson did to the conversation between Hodge and Edwards. "It was about 7 o'clock that I saw Hodge. I had come out of the tipple to get a plank, and Hodge and Anderson came there together. Hodge asked me what I was doing. Ab. Edwards was the fireman. He was the engineer on the engine, and hoisted the men in and out to pump. Hodge spoke to Ab. Edwards, and asked how everything was. Joe Hodge spoke and said: 'Hello, Ab.,' and Ab. said: 'Hello, Joe.' Hodge said: 'How is everything?' And Edwards said: 'All right as far as I know.' Hodge said: 'How long have you been going?' And Ab. Edwards said: 'An hour and forty or forty-five minutes.' Clarence Anderson was present. Little John White was around somewhere. Don't know whether he was right there or not. Hodge was coming up with a bucket or something like that. I left Hodge and the others there. Don't know where Hodge went from there. I saw him after he was burned. Ab. Edwards was night fireman. He acted as engineer, and pulled or let any one down or into the mine. Nobody was let up or down that night except Hodge."

The superintendent, Lee McDowell, testified: "That it was the custom to cool the boilers on Sunday and clean them out and repair them if necessary; that they were allowed to cool down after 4 o'clock on Saturday when the men were out. They were fired up on Sunday for the purpose of pumping the water out and running the fan, so as to have the mine safe for the men on Monday. No certain time was fixed to begin pumping, but about a week before the accident I had arranged with Hodge for him to start pumping no earlier than 9 o'clock on Sunday night. I wanted him to go in later and have the water lower next day for the men do not want to work in the water. I told Hodge on the Friday before he was hurt on Sunday that I did not want to start earlier than 9 o'clock from that time on. We could not pump when the mine was running, and had to pump when we were not hoisting coal. It took two hours to get up sufficient steam to run the fan and pump after the fire has been started under the boilers. It would take that time if the water was cold. After the steam was turned to the fan, it would take 10 or 20 minutes to start

them.    I think it would take an hour and a half to two hours to
clean out the air course.    I would not want to get into that air
course under an hour and a half or two hours after the fan was
started.    The air course near the pump is the long way around
for the air to travel through the mine, and would be the last place
where the gas would pass.    The air goes down the shaft and
travels the east and west entries and comes back through the air
course bringing the gas.    When it gets back into this air course,
it is on its way out of the mine.    Mr. Hodge knew it would take
this long to clear the mine of gas.    He had been told he could
not go in there under an hour and a half or two hours.    I told
him that myself.    He had worked constantly at the mine for six
years, to my knowledge.    He was acquainted with the conditions
of the mine.    I told Hodge, when we cooled down and the fan
had not run, to give an hour and a half to two hours before he
went down after the fan had started.    It was understood that no
one was to go in and go away from his pump.    Hodge had
charge of the machinery, and did all the repair work; gave direc-
tions to all of the men that worked around the machinery.    It
was his duty to fix any of the machinery that did not work.    The
fireman always let him up and down at night.    Hodge was let
down and up under his own directions.    He would go there and
let the fireman know he was ready to go down, and the fireman
would let him down.    It was the fireman's duty to let Hodge
down whenever Hodge said so.    Hodge decided for himself when
he should go down and should come up.    He went down when he
got ready, and when he wanted out on top he pulled the signal
from the bottom.    It was Hodge's duty to decide when the mine
was safe enough to go down.    He knew, if the fan was stopped,
that the mine always made gas.    He knew gas remained there
until it was cleared out.    It was his duty to find out if it was
safe to go down.    The fireman had nothing to do with that. * * *
The fireman could not tell when the fan was started, he had no
way to know.    It takes steam some time to reach the fan, and the
fan might be standing still with a break in the pipe, and steam
would still be going up, and the fan not running.    If the fan had
been stopped and started, one would have to see the fan or test
the air at the shaft in order to know whether the fan had started.
If one takes a lamp and holds it over the shaft, if the fan is

running, it will pull the blaze down, but he could not tell how long the fan had been running. The only way to find out how long the fan had been running was to go to some one who knew. The only way was to go to the fan man. The proper party to ask as to how long steam had been up and turned to the fan was the fireman, Ab. Edwards. At that time the fan was the only thing that was drawing on the boilers. There was no other engine in operation. The engineer would know, if the fan was not in operation, the pipe had burst, and also if steam was going into the pipe that the fan was in operation, but the steam might escape without being turned to the fan. There was no bursting of the pipe on that night. If steam was turned on, and if it got to the fan, if the fan man did his duty, the fan was put in operation. If the fireman told me he had turned steam to the fan an hour and forty-five minutes before I started to the mine, and if I went to the mine and got there all right, and if when I went to the shaft I could tell by the pull of the air the fan was in operation and that no pipe was broke, I would think everybody had done his duty. I would believe the fan had been in operation an hour and forty-five minutes. Any reasonable man would believe it. In that event I would go down myself. If the facts were as above stated, and if Hodge had grounds to believe the fan had been running an hour and fifty minutes, I do not think he used bad judgment in going down. I would have done it myself. It was safe to go down in an hour and fifty minutes or two hours."

The pump was started by going to the bottom of the shaft and turning the steam into the engine there, and there was some testimony tending to show that it might be safe to go to the pump after the fan started in much less time than to go to other places in the mine, and especially in the air course.

The witnesses understood from Hodge when he came out of the mine that he had been burned by the explosion in the chamber near the pump, but it was shown that he had gone away from the pump into the air course, supposedly for the purpose of plugging one of the pipes. The pin he had been making and a hammer were found in the course and also the lamp which he was wearing; and the bradishes had been blown out of the course at this place. Other testimony will be noticed in the opinion.

The court instructed the jury, and they returned a verdict on

both counts of the complaint, in favor of the estate, in the sum of $3,000 and for the benefit of the widow and next of kin in the sum of $2,500.   From judgment thereon defendant appealed.

*Read & McDonough,* for appellant.

1. . Appellee as administratrix had no legal capacity to sue for pain and suffering endured by the deceased.   Unless a cause of action is created and conferred by some statutory enactment, because of a wrongful death, the right of action does not exist. 41 Ark. 382; 33 Ark. 353 ; 34 Ark. 493.

This court has held that under the Lord Campbell Act two actions might exist to recover damages for a wrongful killing—one for the benefit of the next of kin, and the other for the benefit of decedent's estate.   54 Ark. 358; 68 Ark. 1.   But there is no provision in the coal mine act, Kirby's Dig. § § 5337 *et seq.,* for any survivor of a cause of action, nor in the amendatory act thereto (Acts 1905, p. 569, § 4) in favor of an administrator for and on account of pain and suffering of the deceased.   70 Ark. 434; 157 Fed. 660.

2. If appellee sues as administratrix, she cannot sue as widow, nor can the children sue.   76 Ark. 555.   See also 71 Ark. 342; 34 Ark. 144; 46 Ark. 251.

3. Appellant's motion for continuance should have been granted because it was taken by surprise by the filing of the amended complaint setting up a new and separate cause of action long after the case had been at issue, and after same had been properly set for trial, and after both parties had announced ready for trial on the issues raised by the pleadings already on file.   67 Ark. 142; 71 Ark. 197.

4. The testimony of Norton and Anderson as to the conversation between Hodge and Edwards was inadmissible.   It does not support or tend to support the allegations of the complaint.   55 Fed. 949.

5. It was error to admit the testimony of Linn and other witnesses tending to show that when Hodge asked Edwards how long he had been on or how long he had been going he, Hodge, meant to inquire how long the fan had been running.   Testimony is not admissible to show the meaning of words which are clear and certain in their meaning.   61 Ark. 81 ; *Id.* 414; *Id.* 36.

*Davis & Pace, U. L. Meade* and *Brooks, Hays & Martin,* for appellee.

1. The suit is not and was not prosecuted under the coal miners' act, but under the general statute. Kirby's Dig. § § 6285-6290. The amended complaint states two causes of action, one for the benefit of the estate of the deceased, Hodge, and the other for the benefit of his widow and next of kin. This court has held that these two causes of action may be joined in one complaint and proceed together in the name of an administrator. 53 Ark. 117.

In construing the pleadings, this court will give that construction to them, if possible, that will uphold the judgment of the lower court. 63 Ark. 563; *Id.* 134.

2. There was no abuse of discretion in overruling the motion for continuance. 93 Ark. 119.

3. There was no error in admitting the testimony of Norton and Anderson as to the conversation between Hodge and Edwards. Hodge's question was an inquiry as to how long the fan had been going, and that it was so understood by Edwards is shown by his statement when testifying that " I told him, 'I am ready now, except I have just turned the steam up to the fan.' " Under the court's instruction, if the jury had credited Edwards' account as to what was said, there could have been no recovery.

KIRBY, J., (after stating the facts). The action was brought under the general law, as shown by the amended complaint, and not under the miners' act, as contended by appellant, and the administratrix of the deceased was the proper party to sue for damages on account of his wrongful death, alleged to have been caused by negligence of appellant, and could in the same suit recover both for the benefit of the widow and next of kin, and of the estate. Sections 6285 and 6290, Kirby's Digest; *Davis* v. *Ry.,* 53 Ark. 117. Any uncertainty or defective allegations of the complaint should have been reached by a motion to make more specific, and the demurrer to the amended complaint was properly overruled.

It is next contended that the court erred in overruling the motion for a continuance. The action was brought in October, 1908, and at the first hearing resulted in a mistrial, and after the parties announced ready for trial on April 12, 1910, appellee filed

the amended complaint. Appellant set up in its motion that it was taken by surprise by the filing of said complaint, which it alleged set up new acts of negligence and an entirely new cause of action, but the cause had been tried once and the complaint was amended to conform rather to the testimony that was developed at that trial, and omitted all charges of negligence, except that of the fireman, and more specifically set out his negligence, giving his name, and all of the witnesses who knew anything at all about the occurrence and transaction were present at the trial and testified, and no injury could have resulted to appellant, because of the refusal to grant a continuance. The granting of a continuance is within the sound discretion of the court, and no abuse of that discretion is shown here, and no error was committed in overruling the motion. *St. Louis, I. M. & S. Ry. Co.* v. *Webster, ante* p. 256; *St. Louis S. W. Ry. Co.* v. *Jackson,* 93 Ark. 119.

The court's action in admitting the testimony of Anderson and Norton relating the conversation between Edwards, the fireman, and deceased before he was lowered into the mine, and that of Linn and others as to its meaning, is also assigned as error. It is first objected that if the conversation occurred as detailed by them it did not tend to support the allegation of the complaint that "he asked Ab. Edwards, who was in charge as above set forth, for what length of time the fan had been in operation," no reference being made to the fan at all; and next that error was committed in permitting Linn and others, who had been long at work in said mine, to state that they would have understood from the questions and answers that deceased was asking of the fireman about the length of time the fan had been running and receiving information about the operation of the fan. Edwards denied having the conversation with Hodge as testified to by Norton and Anderson, and stated that Hodge said, "How long before you are ready?' And I said, 'I am ready now except I have just turned the steam up to the fan.' He said, 'I will change clothes and eat a bite, and by that time I guess everything will be all right.' He went in the mine between twenty and twenty-five minutes afterwards—about twenty minutes, I reckon." According to his own statement, he understood that Hodge was asking about the time the fan had been running, regardless of the

form of the question.   If the questions and answers given by the parties had any special significance or meaning among the miners by whom they were in use, it was competent for those familiar with such usage to explain it to the jury, otherwise not; and if not, the jury would have known it was used in its common and ordinary acceptation and understood its meaning.   In either event, no prejudice could have resulted to appellant because of its introduction and explanation, the court having instructed the jury to find for appellant if "Edwards told Hodge that he had just turned the steam up to the fan," and also if the questions and answers related by Norton and Anderson "were not understood by Ab. Edwards to be an inquiry as to how long the fan had been running the plaintiff cannot recover."

It is strongly urged that the court should have given a peremptory instruction directing a verdict in favor of appellant.   The testimony shows that the deceased, Joseph Hodge, was an experienced miner, long acquainted with the conditions existing at the mine in which he was injured, having been employed there for more than six years; that he knew of the dangers caused by inflammable gas produced by the mine; that he knew of the arrangement made for clearing out the gas by the operation of the fan and the time it took to clear same out and make it safe for persons going into the mine.   He was acquainted with the use of miners' safety lamps, and knew that some were kept on hand in the engine room for use in the mine, that an explosion was not likely to occur, even in the air course where it was dangerous with an open lamp when the safety lamp was used, but he also knew that when the fan had been in operation from an hour and thirty minutes to two hours it was safe to go into any part of the mine without such safety lamp.   He came to the mine on this Sunday, which had been in charge of Hudson that day, about 7 o'clock, the time he had usually gone down on Sunday evenings. He asked the fireman, whose duty it was to give him information, as to the time the steam had been up and the fan had been in operation, that he might decide whether it was safe to enter the mine to start the pumping engine and clear the mine of water, as it was his duty to do.   About the question asked the fireman by him, and the answers given, and the meaning intended to be conveyed, and what he understood therefrom, there is decided

conflict. Hodge asked the fireman how long he had been on, or how long he had been going and the fireman told him an hour and a half to an hour and forty-five minutes, thinking, it is insisted, he was asking as to the time the fireman had been on duty, and had the fire going under the boilers, and not meaning to inform him that the fan had been in operation that time. Hodge said he supposed it would be all right in fifteen or twenty minutes, which would have made two hours, if he understood from Edwards that the fan had been in operation the length of time he mentioned. In any event, within about that time he directed Edwards, who thought he was going too early but said nothing about it to him, to let him down into the mine, and within a few minutes the explosion occurred, and the signal was given, and he was hoisted out badly burned, from the effects of which he died two days later after much suffering.

It took about two hours after the fire was started to generate enough steam to operate the pumping and fan engines, and the appellant contends that Hodge might have gone safely to the pump and started it within a short time after the fan had started, or before it had started in fact, if he had gone no further than to the pump, and that he was only asking Edwards as to the time he had been on, that he might know whether there was sufficient steam to operate the pumping engine, and that the jury should have believed the testimony of Edwards, denying that any such conversation occurred as testified to by Norton and Anderson, and stating that he replied to Hodge's question, "I am ready now except I have just turned steam up to the fan." It was Hodge's duty, not only to operate the pump but to repair all the machinery and pipes attached thereto and necessary to be kept in repair in the successful operation of the pump and removing the water from the mine, and at the time of the explosion he was in the air course where it was dangerous to be with an open lamp within less than two hours after the fan had been in operation. There was a leak in the pipe in the air course which he had evidently gone in to repair, as shown by the wooden plug and the hammer found where the explosion occurred. It is also true that some of the witnesses testified that he said after he came out, in explanation of how the injury occurred, that he went down a little too soon, but this statement was only made because the explosion conclu-

sively showed that he had gone in before the mine was cleared of gas, and was not an admission that he was negligent in doing so.

The court in specific instructions told the jury, if Edwards told Hodge that he had just turned the steam up to the fan, or if Hodge's questions were not understood by Edwards to be an inquiry as to how long the fan had been running, plaintiff could not recover, and the jury evidently believed, as Hodge's actions in going down into the mine indicated, that he was inquiring of Ab. Edwards as to the time the fan had been in operation and understood from his answers to the inquiry that it had been in operation the length of time mentioned. In coming to this conclusion they could rely upon their common knowledge and experience of human affairs, that all men take thought for the preservation of their lives—"yea, all that a man hath will he give for his life"—and would not have gone into the danger and to his death had he understood the answer to his inquiry otherwise.

There was testimony sufficient to sustain the verdict, and the court did not err in refusing the requested peremptory instructions. He had the right to rely upon the information which he understood had been given him by the fireman, whose duty it was to give him the information, and of whom it was his duty to inquire as to the length of time the fan had been in operation, that he might decide whether or not it was safe to go into the mine, and, having received such information and acted upon it and been injured because of the very danger which he would not have gone into but for the misleading information, it was the proximate cause of the injury, and appellant is responsible therefor. *Pulaski Gas Light Co.* v. *McClintock,* 97 Ark. 576.

There were many objections to the instructions given by the court on behalf of the appellee and also to the failure and refusal of the court to give instructions requested by appellant, but, upon the whole, the instructions given to the jury by the court, while one or two for the plaintiff were long and rather involved, fairly submitted the question at issue to the jury, and we do not find any error committed in the giving or refusing of said instructions.

Finding no error in the record, the judgment is affirmed.

ON REHEARING.

Opinion delivered June 12, 1911.

KIRBY, J. It is urged that the court erred in failing to consider and reverse this cause on account of the admission of certain incompetent testimony of witness Fitzgerald. He was being examined relative to the pain and anguish suffered by deceased, and, after describing it and stating that he was conscious all the time and talked about his family, testified, over objection of appellant, as follows:

"Q. What did he say about his family? Tell, if you can, what he said about his family? A. He said like this, that he would not get up again, and he would leave his little children in bad shape. Q. Did he say it like you are saying it? A. Yes, sir; he talked reasonable. Q. Knew and realized what he was doing? A. Yes, sir. He said like this—he said that it would be impossible for him to get up again, and he would leave his little children in bad shape. That is what he told me and Doc."

This testimony was not competent except as it might tend to show the injured person was conscious, and not necessary on that account, that fact not really being disputed. Its admission was not harmful, however, since the widow had already testified without objection to the condition of the family, as follows:

"Q. Who is living with you at the present time? A. Just my little children. Q. Are you on a farm? A. Yes, sir; but I am not making any crop. I am working by the day and taking in washing."

The incompetent testimony was not pressed upon the attention of the jury in argument, and did not result to the injury of appellant in the award of damages, for the jury could well have found under the testimony the whole amount of the verdict on either count of the complaint without their verdict being excessive.